Case number 18-1161 at L. UPS Ground Freight, Inc. petitioner v. National Labor Relations Board. Mr. Larkin for the petitioner, Mr. Weitz for the respondent. Mr. Weitz for the respondent. Mr. Larkin. Good morning. Mr. Larkin. May it please the Court, Kurt Larkin representing UPS Freight. The NLRB's bargaining order cannot be enforced because it is the product of numerous errors that prevented my client's meaningful participation in the underlying election case and interfered with its statutory right to communicate with employees during the campaign. I'd like to spend my time today addressing three key errors, each of which would be grounds for refusal of enforcement. Number one, in violation of the Board's own case law, the acting regional director here erroneously ordered a mail-in election rather than the Board's preferred in-person voting method. Now, this decision prematurely cut off my client's right to have group campaign meetings, which are by far the most effective means of employer campaign speech for the final 18 days of the voting period. Number two, the acting director's refusal to decide the supervisory status of union supporter Frank Capetto before the election left my client in limbo on whether it could legally require him to reverse course and support the company. This failure to decide was another unwarranted restriction on the company's ability to communicate with its employees. And third, in view of these and the acting director's numerous errors in connection with the pre-election process, his refusal to grant the company a post-election objections hearing was an abuse of discretion. Now, in each one of these cases, the acting director failed to balance UPS's interests with the NLRB's own, and I'll quote, relentless zeal for slashing time from every state of the current pre-election procedure. Now, those aren't my words. Those are the words of the board members who opposed, strongly opposed, passage of the current regulatory framework for handling elections. I understand you're not challenging the framework on its face. Is that right? We're not raising a facial challenge, Your Honor. But I think what we're saying is that the policy imperative underlying those regulations,  without regard for whether rushing through the process is denying the employer a fair shake, that is the imperative that drove every decision reached by the acting director in this case. How long was the union campaign going on before the petition was filed? We have no idea, Your Honor. And one of the problems with this rule or in the application of the rule in a case like this is that, as everyone who practices labor law knows, the union can campaign in secret before it files a petition for as long as it wants until it believes it has sufficient support to file the petition. The unit was 30 employees? Yes, Your Honor. How many of them signed authorization cards? We don't know that either, Your Honor, because when we asked the acting director at the beginning of the case when we first got the petition and we submitted evidence in our statement of position that Mr. Capata was both we believed he was a statutory supervisor and that he was basically leading the union organizing campaign on behalf of the employees, and we suggested that as part of the pre-election process the acting director do what the region is required to do. Let me back you up. The law is that you have to have at least 30%, right? That's correct. To get an election. Yes, Your Honor. And you also cite an NLRB case that says that if a supervisor solicits authorization cards to the employees, that those authorization cards are invalid. Is that correct? Yes, that's the Harborside case. So Mr. Capata, there's a suggestion in your reply brief at least that he was involved with getting authorization cards signed, but I noticed that he testified. And on cross-examination, your client, I don't know whether that was you doing the cross-examination or not, but during the representation hearing, he was never asked about it. Well, you're correct, Your Honor, and the reason is because we were barred from litigating that issue in the pre-election hearing. The only issue we were allowed to litigate at the pre-election hearing, besides, of course, the bargaining unit question, was whether he was actually a statutory supervisor. We were shut down from asking any questions about whether he was involved in card signings, whether he was campaigning for the union, anything about that. We weren't allowed to touch it, and that's part of our problem. Was there a written order to that effect by the hearing officer? The hearing officer stated at the beginning of the hearing that there would be no litigation on that issue. She also stated— Transcribed? Was that transcribed? I don't remember, Your Honor, but there's an e-mail in the joint appendix, and if you'd like, I could find it for you, where when we were asked to present our evidence of supervisory taint after we submitted our position letter, we presented that by an offer of proof made to the hearing officer by e-mail the day before the hearing. For these questions, just so I understand, you don't get to supervisory taint unless you have a supervisor? That's correct, Your Honor. So if there's an antecedent determination that he's not a supervisor, do you have to overturn that determination in order to get to the questions of whether things having to do with cards or anything like that is problematic? Normally, Your Honor, I would agree with you. The reason I don't in this case is because I don't think this record permits the court to touch that issue, and the reason I say that is because it was so prejudiced and compromised by the way the acting director conducted this process. I mean, if you just take a look at some of the things that Board Member Mishramar cited in his dissent, this rule, as bad enough as it is, it only gives you seven days to prepare. I don't think this is quite the answer to the question. So the question is, if we were to find against what you want, but if we were to find that he was not a supervisor, notwithstanding the procedural arguments you're about to make, then the question of taint by a supervisor we would not have to reach. Is that right? That's correct, Your Honor. So now you're on the question of whether he really either was a supervisor or whether you had sufficient chance to make that argument. Yes, Your Honor, and although we say in our brief, certainly, we believe we presented evidence in our statement of position and then at the hearing, and then we attempted to present additional evidence of his supervisory status in our offer of proof, which, of course, was rejected. We believe we presented evidence that would establish he's a supervisor, that he could assign work, and that he did do it with independent discretion or independent judgment. Our point is that on this record, that's not a decision that the court should make, and that's because of how compromised our ability was to put on our case both during, before, and then after the election. When you say opportunity to put on your case, you're talking about the opportunity to put on the case as to whether he was a supervisor? Well, actually, Your Honor, I'm talking about everything, but, yes, that in particular. And, you know, if I could, I'd just like to run through some of the things that happened. So this rule, yes, Your Honor. Specifically on what prevented you from putting on a case about whether he was the supervisor? Yes, Your Honor, and I'll just be blunt. We were not given enough time. This rule gives the employer seven days to put together a binding statement of position. That was never the case before this rule. And all issues that are not raised and information that's not included in the statement of position are waived, okay? We filed a motion asking the acting regional director to give us a two-business-day extension so that we could marshal more evidence. And the position statement under the board's hearing notes was due on a Thursday, okay? The first time that we could meet with our client was Wednesday. So now, even though the rule gives us seven days, we have one. We asked for a two-business-day extension. That would leave us until the following Monday to put together our evidence. He gave us one business day. And, of course, now they say they granted the motion. They partially granted it. They partially denied it. But, you know, what that left us with was basically from the time we got on the ground on a Wednesday, and bear in mind we were also trying to develop evidence to support our bargaining unit claim, until Friday at noon to speak now or forever hold our peace. And, you know, the weekend didn't do us any good because once that position statement came into the region on Friday at noon, we couldn't develop anything new over the weekend. Sure, we could prepare to litigate what we were able to muster by Friday at noon, but we weren't able to develop anything new. And, you know, I would respectfully say one-and-a-half days just isn't enough time. And, you know, the other thing you want to raise about this are whether or not he had the authority to assign work, right? Well, yes, that is the issue that we raised. And also whether or not he had the authority to hire. Well, we did raise that issue. I think our primary contention is that he could assign work under the prevailing precedent. Right, but the question of authority to assign, you controlled the supervisors and the hire management, and they could have testified that he had that authority. Well, Your Honor, we did two things. You're correct. We attempted to put that evidence in our post-objection offer of proof. Not post-objection. I'm talking about before. Well, you know, could we have? I suppose we could have, Your Honor, but again, you know, I don't think I can overstate the state of affairs that, you know, that we were experiencing in this process. We had one-and-a-half days to figure out what we were going to do. And so we did the best we could in a day-and-a-half. What happened to the five-day period? I mean, the petition comes in on the 10th of the month, right? That's correct. But there was no response until the 15th. We weren't in a position, due to other commitments, to meet with our client until the 16th. And so we presented that to the acting director in our motion. And so when I say a day-and-a-half, the reason is because of the circumstances surrounding the timing of the petition. I mean, now, bear in mind, this was the petition was filed during the holiday season. It's one of the busiest times of the year for everyone. And so, you know, it was the circumstances of that combined with a council availability, you know, left us with the time that we, you know, we had to gather evidence and complete the statement of position. And that's why we asked for the two days. One of the points you make, I find this procedure rather odd. The employer has to file a statement of position. Yes, Your Honor. In response to the petition that the union files for seeking an election. But the union doesn't have to file a statement of position. It doesn't have to set forth what witnesses it's going to call or anything else, does it? No, it doesn't, Your Honor. And that's, again, one of the problems with the rule is that this statement of position obligation, you know, for lack of a better term, distracts the employer. So we have eight days under the rule to get ready for this hearing. But the majority of that time is spent trying to marshal information into a new requirement of this statement of position. And if you don't get it in there, your case is waived. You have to say something about why this is particularly important in your case and not in the mine run of cases because you're not attacking the rule on its face. Well, Your Honor, that's correct. We're not attacking the rule on its face. We're attacking the numerous abuses of discretion committed by the regional director. We've only been talking about a single one. There are too many others to discuss in the time we have left. But, you know, he didn't give us the appropriate time, we think, to prepare this evidence in the SOP. We went into a hearing that it was beyond clear that the region intended to complete it in a single day, despite the fact that we asked for numerous times, both on and off the record for continuances, to try to develop additional evidence. You know, I would note that the cases that the Board cites, Allied Aviation, employer got a five-day hearing. Veritas, four-day hearing. Salem Hospital, one-week hearing. We were rushed through less than one day, forced to present evidence until almost 7 p.m., literally until we ran out of witnesses. Well, what was the issue besides the scope of the bargaining? The scope? There was another issue, Your Honor, about whether Mr. Capetta and another employee were dual-function employees who couldn't vote in the election. But the vote was 27 to 1, so those two employees, whether they could vote or not vote didn't matter? No, Your Honor, but I'm glad that you referenced the vote because there's a point I'd like to make about the vote. The Board says there's no prejudice here because, hey, you got blown out, right? I would suggest that the proof is in the pudding. Employers tend to lose elections when they get a muzzle put on them and when their most effective means of campaign speech, which is group campaigning, is shut off based on legal error, and that was the acting director's ordering of a mail ballot. So your argument about that, does that apply to every mail ballot election? No, Your Honor, it doesn't. And, you know, the cases are clear that it is a— Why doesn't it apply to everyone? Because I thought your argument was that because it was a mail ballot election you weren't allowed to do this mass— Oh, I'm sorry, I misunderstood. What I'm saying is that we're not saying that a mail ballot is an inappropriate means generally. We're saying that in this particular case, the acting director was simply wrong on the law in deciding that the voting unit here was a scattered unit under the precedent. And, you know, he based his decision on two things, speculation and mistake. First, he speculated that the voting group might be scattered because they drive trucks and they would be out on the road and it might be icy because it was winter. There's no record evidence that it was going to be icy on the day of the election. But his key mistake was that he misinterpreted our proposal, which would have had employees all vote before leaving on their shifts. They all have to come to the terminal, pick their trucks up, so they all can be in the same place at the same time. That's not in dispute. And we offered to arrange the dispatch so that they could all vote before they left. His decision says they're scattered because they could get stuck on the road and they won't return in time to vote. He was simply wrong on the facts. Isn't the normal reason that the board— when the board rejects mail ballots because of concern about turnout, about percentage of the voters actually voting, and here almost virtually everybody in the unit voted. Yes, Your Honor. And we're not saying that we were prejudiced by the vote count. What we're saying is that we were severely prejudiced by the impact, the legal impact that a mail ballot has on the employer's right to campaign. Is there any board or circuit case that regards the mail ballot issue as turning on time to campaign? Well, I'm not aware that that issue has been raised. In any case, it's cited in the briefs. But what I can say is that in the Federal Register, when the board majority who passed this final rule passed it, when they were addressing concerns by the employer community about— and it's 79 Federal Register, 74323. When they were addressing concerns from the employer community about how hard this rule was going to be on employers because it was going to truncate the campaign period, the board rebutted that concern by saying that employers can mitigate that through group campaigning. It's right in the Federal Register. So the board looks to group campaigning as one of the reasons why, in its view, the rule doesn't prejudice employers. That was taken from us. When you talk about campaigning— Yes, Your Honor. I thought the rule only applied—the bar— the rule only applied to a captive audience, a big assembly. You get all 30 employees into the gymnasium and then give a speech. You can't do that. But you can campaign individually. Well, you can campaign individually, Your Honor, but it applies to group meetings. So it doesn't have to be all 30. But you can campaign. It's not all campaigning. That's correct, Your Honor, but with respect. I know the board has said that, but that's like saying that because we're only a little prejudiced and not totally prejudiced, that we lose. But you can even have a group meeting. Just as Judge Randall said, it can't be mandatory. You can't compel attendance. Well, Your Honor, I think that might be right. I'm not sure, standing here right now, whether that's right. But the fact remains, with this particular bargaining unit, it is very difficult to communicate. In the San Diego gas case, I think it said you can continue to have group meetings. The only thing you can't do is compel attendance. It can't be mandatory. That's correct. I would say that the part of San Diego gas that addressed that was dictum. It didn't have anything to do with the legal test being developed in the case, and it was addressing concerns raised by the dissent, concerns that we've raised here. I'm not sure why the dictum matters here. That is, your complaint, as you just expressed it, was you didn't have sufficient time to campaign. Even if the board said in dictum that you do have time and here's the ways in which you can legally continue to campaign, and the only thing you can't do is require employees to show up, you could have done that. And there's no – I mean, maybe if then the board came down on you for a violation, then you would have to point to dictum to support yourself. But it seems like pretty good support for the proposition that that would not have been unfair labor practice. To force them to show up? Not to force them, no, to have meetings at which people can speak to in groups. The only thing you couldn't do is force them to show up. Again, as I stand here, I'm just not sure of the answer to your Honor's question. What I would say is that this particular unit, the only effective way to communicate with this particular group was to make them all come before they got in the trucks and left. Because once they got in the trucks and went on their delivery runs, there's no way to talk to any groups of them. And so the best way in this particular case for the company to communicate with this group, which it did prior to this ruling coming down, was to get them all before they got in the trucks and left, make them be there, which we're legally entitled to do, and communicate whatever the campaign message may have been that particular day. That's the part that was cut off from us. And I would just say, and I know we're way over my time, so I'd just say before I sit down that the Ozark case, I think, makes clear when it comes to a question of whether all this prejudice is the employer. I know that's what the Court is getting at. It's not whether the outcome would have been different. It's whether it could have been different. And it is indisputable that when you put together all of these errors, the mail ballot error, the supervisor error, failing to investigate the taint question, failing to give us the time we believe we're entitled to in this hearing, not letting us write a brief, giving us what I can only characterize as a laughably short amount of time at the end of that process to put together a closing argument. You put all that together, and we believe that it's not in dispute that certainly things could have been different if we had been given the things we asked for. And I would just say, if this is the Board's idea of a fair hearing, I would hate to see what an unfair one looks like. All right. We'll hear from the Board. Good morning, Your Honor. Eric Weitz on behalf of the National Labor Relations Board. I guess I'll just respond to the arguments that were discussed in Petitioner's section of the argument. Starting with the principal question, is this the Board's idea of a fair hearing? Well, yes, Your Honor. I think, in fact, this hearing was very ordinary based on the general course of these type of pre-election hearings. One point on that that I'd like to make is there was a lot of discussion in the previous argument how the Board's new rules only grant seven days for the statement of position, et cetera. However, in this case, there's actually 11 days between the petition being filed and the pre-election hearing, which was well within the range of Board pre-election hearings for decades. It's not unusual. It was not expedited. Eleven business days? Eleven total days because the regional director granted in part the one business day. You had a weekend, didn't you? Yes. So it's 11 calendar days, Your Honor. But that's been the Board's practice for decades in these type of hearings. In fact, before the 2014 rule revision, which were not being challenged spatially, the Board case law held that the minimum notice was five calendar days. So 11 calendar days is well within the norm. There was no prejudice here. The employer has never argued that it was prejudiced by not having witnesses available. I'd point the Court to the motion that was presented to the regional director for a two business day extension, which is all that the employer requested. And the only reasoning provided there was that one of the counsel for the employer was not available to meet in person with the employer's officials until the following day. And in light of that fact, the regional director granted the one business day extension, which was, in fact, a three calendar day extension over the objection of the union. And there was no other reasoning provided to the regional director, such as witnesses not being available or evidence that could not be collected or any similar prejudice. A similar point that was discussed is the statement of position. And just to be clear, if the Court looks at Board Exhibit 3, which includes an example of a statement of position in this case, what's called a statement of position is essentially a one-page form that parties are required to employers are required to file before the pre-election hearing. Most of that form includes routine questions, such as whether the employer admits that the board has jurisdiction over it based on its commerce standards. And employers are also just supposed to identify issues that they're going to raise. It does not require them to provide all of the legal arguments that they're ever going to make. They also have to list all the witnesses? Your Honor, I don't recall. I'd have to look at the form. And if they don't, then they've waived the right to call the particular witnesses? They have to identify all the issues? The form is only one page, but the addendum to the form was how long here? Well, in this case, Your Honor, the employer filed an unusually long one. They essentially filed an entire brief setting out all of their legal arguments in addition to the other requirements. But on the waiver issue, I'd point out that the board's rules say you need to identify the issues you want to litigate at the hearing. But there is an exception where if something was not raised, the regional director can allow it to nonetheless be litigated if special circumstances are showed. And there's also, in terms of voter eligibility, that is never waived. So the purpose of the form is essentially just to make clear before the hearing begins. It's typically the day before. In this case, it was three days before. What the employer wants to raise at the hearing. Why doesn't the union have to file one, too? Well, Your Honor, the union is not really raising issues because by filing the election petition in the first place, it's clear their position, which is that this is an appropriate unit and we want these employees to go to an election. I looked at the union's form. It doesn't tell you what witnesses they're going to call. Yes, Your Honor. The employer has to list the witnesses. The union doesn't. Why? Well, Your Honor, I think the purpose of that is the employer is generally the party that's challenging an election and forcing us to go to a hearing in the first place. A hearing is only required because the employer is not agreeing to a stipulated election agreement, and generally it's because the employer is challenging either the appropriateness of the unit or the eligibility of a substantial number of voters. And for most of these issues, the employer is the one who has the burden to explain why the petition for a unit is inappropriate. And in that sense, the employer is essentially the petitioner causing the hearing to occur. Does the union have an obligation to establish that at least 30 percent of the employees in the unit support the union? Yes, Your Honor. Well, that's the showing of interest. But just to clarify how the showing of interest functions, it's purely an administrative tool for the agency itself to decide whether it's worth exerting resources to continue to a hearing. Once the board-supervised election occurs, as it did in this case, the showing of interest is essentially irrelevant because the employees have now spoken through a secret ballot election, and here they voted 27 to 1 that they wanted a union. So the showing of interest as an administrative tool is no longer relevant. The issue that the employer has raised... But is it relevant to the union's right to have an election? Well, it's not, Your Honor. Once the election has occurred, it's... No, no, there will be no election. If less than 30 percent of the employees support the union, there's not going to be a representation election, right? That's correct, Your Honor, but that's an administrative determination. That's not before the court. It's irrelevant to the question that the court needs to decide in this case because the election ultimately did occur here, and it's very clear that a sufficient number of employees, in fact, nearly all of the employees, wanted a union. So the issue that is still arguably at issue is whether there was conduct that would have tainted the showing of interest that also could be alleged to have tainted the election. And there was some questioning, I believe, from Judge Randolph about Mr. Capetta's alleged solicitation of authorization cards. I just want to clarify to the court that there's absolutely no evidence that that occurred. The employer has never proffered any evidence. Their argument is that, assuming he's a supervisor, he theoretically could have solicited authorization cards. There's no evidence that he spoke to a single member of this unit or a single eligible voter and expressed his opinions about unionization one way or the other, or certainly that he solicited authorization cards, which is the type of conduct that could potentially be objectionable. The employer has now had over three years to muster evidence that it could allege that it would have presented if there was a post-election objections hearing, and that evidence simply does not exist. The only two pieces of evidence that they proffered is, first, that weeks or months before the petition was even filed, that Mr. Capetta spoke to. I'm sorry, let me interrupt you for a moment. I have a pesky fact question. This is whether the statement form actually asks for witnesses. We seem to be assuming that it does. The argument of opposing counsel is that it didn't have a chance to come up with witnesses over the weekend. I'm looking at the form at J359 and 360. I don't see that question. You seem also to assume it's there. What's the answer? Well, Your Honor, I tried to answer earlier that I did not recall whether that was asked. If you took a moment and looked at it, would you have another view, or is this too hard a question? I'll tell you what, I'll leave it. Well, Your Honor, respectfully, if the form is in front of you. I'll ask opposing counsel on the problem. Okay, but I would also point out, Your Honor, that it's not clear to me that the employer is actually arguing that listing the witnesses was somehow prejudicial. One thing he argued was that they weren't able, once they filled out the form, they weren't able to find more witnesses to support their case. Therefore, they weren't able to use the weekend. Well, Your Honor, I don't recall seeing that in the briefs in this case. If that's a new argument, the Board's position would be that it's improperly raised at this point. But, again, I just return to the argument that at no point has the employer ever identified a particular witness by name who was unavailable for some reason and could not be available on this day as opposed to the next day. The hearing was on a Monday. The employer had requested that it be delayed to a Tuesday. So the only issue here is whether this one extra day somehow prejudiced the employer. And, of course, it's the employer's burden of proof to establish actual prejudice, to establish an abuse of discretion. What about the problem that the use of the mail ballot deprived them of the opportunity to do as much campaigning as they wanted? Yes, Your Honor. I think that argument is based on a misrepresentation, first, of the facts of this case and of Board law. First of all, just factually, the employer had over a month in this case from when the petition was filed to when the mail ballot election began. And during that entire month, they could have held closed mass captive audience meetings or any other type of campaigning that they wanted to. But just as a legal matter, to clarify to the court, there's a period before the start of any election, whether a mail ballot or a manual election, which is now 24 hours, where neither party, both the employer and the union, cannot hold mass captive audience meetings. They can continue to campaign otherwise. What happened in this case was that the mail ballot began on January 11th, and because of the nature of mail ballots, lasted several weeks. However, if the regional director had ordered a manual election instead, as the employer insisted, the manual election would have been scheduled to begin around the same time as the mail ballot election began in this case, and thus the cutoff for mass captive audience meetings would have been the same, essentially. The board's rules require regional directors to schedule the election for as soon as possible after the decision and direction of election. There's one caveat where the union has a right to 10 days with the Excelsior list to campaign unless the union waives that. In this case, the union expressly waived the 10-day period at the pre-election hearing. And so if this had gone to a manual election, the regional director would have scheduled that manual election for within a few days of when the mail ballot began. And so the notion that the— The argument was that it's just a practical matter. It's likely that the manual election would have started later than the beginning of the mail ballot election, and so therefore you would have had a delta of a few days within which you could have had a mass captive audience. Yes, and that's the point I'm trying to make, Your Honor. Just factually, I believe the employer is suggesting in its brief that the manual election would have began towards the end of this mail ballot period. That's incorrect. The manual election would have been scheduled as soon as possible after the decision and direction of election, which I believe was January 7th. And so, you know, it's a hypothetical. We don't know the exact day that it would have been scheduled. The regional director would have scheduled it, but it would have been within a few days of the mail ballot election. So at most you have—you know, it's a hypothetical, but at most you would have had a few days extra campaigning, as opposed to the cutoff period for mass captive audience meetings that did occur here. But again, since it's the employer's burden to establish actual prejudice, in this circumstance where they had over a month to campaign from the petition, there's clearly no prejudice. And moreover, there was some discussion earlier about, you know, whether the unions campaign in secret and the employer never knows about the campaign until the petition is filed. The Supreme Court has recognized for decades, for example, in the Gissell Packing case, that employers are rarely taken by surprise when election petitions are filed, and they generally know what's going on in the workplace. So there's no evidence of that one way or the other here, but I don't think the court should assume that the employer was surprised and did not know that this campaign was going on before the election petition was filed. One final issue that I wanted to note is the status of Mr. Capetta. Just to clarify, his status was fully litigated at the pre-election hearing. And contrary to the employer, there was no— at this one-day hearing. To clarify, what the employer argued to the hearing officer was that the employer wanted an overnight adjournment solely for the purpose of presenting closing statements. The employer did not identify additional witnesses that it had to call or additional evidence that it wanted to affirmatively present on its own behalf that it could not muster until the following day. If it had done so, it's very likely that the hearing officer would have allowed that. It would have been very unusual for that to be denied. What they were requesting was an overnight adjournment just for the closing statements. Not only is that not required by the board's rules, and as the regional director found, would have been unreasonable, but there's no prejudice that can arise from the failure to present— have overnight to prepare closing statements, where in these type of cases, and in this case in particular, the employer can file a request for review with the board, which involves full briefing so they have sufficient time to fully set out all of their arguments and those go to the board on review. So the employer is never foreclosed from sitting down and writing out all of its legal arguments and presenting them in the manner that it wants to. What actually happened at the hearing was Mr. Capetta's status was fully litigated. One of the main witnesses that the employer called was a recent supervisor at the time, Matt DeVaese, and he was fully examined and cross-examined about the status of Mr. Capetta. Mr. Capetta was a witness as well. And after the election, when the employer made its offer of seeking a post-election objections hearing, they attempted to proffer additional evidence of supervisory status, which the regional director denied because that had already been litigated. But to clarify to the court, the only two pieces of evidence that they even proffered that they somehow were not allowed to present was, first of all, the claim that Mr. Capetta could require drivers to accept particular routes. The proffered evidence for that was testimony from Mr. DeVaese, who had already been called at the pre-election hearing, and there's no explanation why the employer could not have asked that question at the time. I see that I'm over time, but if I could just finish very quickly. Even assuming that that piece of evidence is granted as factual, the employer ignores the Board's decision, which said even if Mr. Capetta could assign within the meaning of act by requiring these route assignments, he did not do so using independent judgment. So even if you assume that this proffered evidence is true, it does not change the Board's ultimate conclusion. And the only other proffered evidence. We'll let you have one. Let's not go on to the only other. Is there any questions from the panel? All right. Well, thank you, Your Honor. I assume that Petitioner's counsel is out of time. We'll let him go over. We'll let you go over. Another two minutes. Thank you, Your Honor. I'd like to try to address a few quick points. On the fact question, I'm not suggesting that you were wrong, but it's all in very small print and my glasses are good, but not good enough to. Yes, I looked at it as well. And the form itself doesn't say list out all witnesses. What the rule says is that issues the party fails to raise in a statement of position are waived. And the regional director, of course, retains the. I thought the rule itself on the waiver part mentions witnesses. If you don't name a witness, you can't call the witness. I wouldn't want to represent that, Your Honor, because I just don't know that to be the case. But we, as labor practitioners, certainly interpret it and practice with that assumption. Several quick things. We did not ask for adjournments solely to make a closing argument. We proffered in our offer of proof, and again, this is part of the problem with the rule, that there were numerous conversations with the hearing officer off the transcript record where we asked for adjournments to come back the following day so that we could work up additional evidence overnight. Granted, those are not in the transcript record. I know that. However, part of the problem with this rule, as the dissenters to the rule noted, is that the regional director is never in the room, never saw him once. The hearing officer is constantly going back and forth off the record, deliberating with the regional director on some of these requests. And so, you know, part of the problem is that it fosters off-the-record conversations. So I thought the argument, frankly, from reading the briefs also, was that you didn't have time to put together your thoughts for a closing argument. Are you dropping that as your complaint? Your complaint is only about not being able to present more witnesses. No, both, Your Honor. I think we said both. I'm not sure about this last one, so I've tried a number of cases. Some judges give us overnight at the end of the witnesses list, these are criminal cases, to make their closing arguments, and some say, counsel, stand up and make your closing argument. Would those trials be violations of due process? With those trials, Your Honor, I would guess that the side being asked to stand up and make its closing argument didn't hear all the evidence for the very first time that afternoon. We don't hear the union's evidence until we get in the hearing room. So we had no transcript. Hearing the evidence for the first time, end of a long day that ran beyond what everyone, I think, anticipated. In some of the trials, the defendant does not hear the argument, the evidence, before either. So, I mean, sometimes you do if it's a gang sect, but that's a pretty limited opportunity and that comes in the middle of the trial. Well, there's a failure of balance here in board cases because the union gets all of our evidence in advance. And in this case, because of the Friday deadline, they got our position statement and all our evidence for three days before the hearing. I wanted to ask you about that. Yes, Your Honor. You just mentioned board. You're talking about the Greyhound case? Board versus Greyhound? Yes. Once an election is ordered by the regional director, what recourse does the employer have other than if the union wins to refuse to bargain and defend on the basis that the election was invalid? Well, as board counsel noted, you can file a request for review, which we did in this case. It was ignored by the board. All of our procedural challenges were ignored. So you filed a request for review with the NLRB and then the election took place without the NLRB acting on your request for review? No, Your Honor. We filed a request for review after the election was over and after our objections hearing. If an election is ordered, what recourse do you have? Well, it's unclear whether there is an election. That's board, isn't it? I believe that's right. I mean, you can't refuse to participate in the election. I've never done that. So I don't know what would happen if an employer did that. I thought the Supreme Court held in that case that the district courts had no jurisdiction in joining an election. I think that's correct, Your Honor, and they wouldn't. They wouldn't have jurisdiction because, you know, I don't know that that controversy would be ripe yet because the election hasn't happened yet, so it would be hard for the employer to say they were prejudiced yet. May I add one thing also to clarify your argument with respect to the appropriate unit? Your argument is that all of your facilities are the more appropriate unit? Your Honor, we raised the contention that the only appropriate unit was a system-wide unit of all of the UPS locations that serviced that particular customer, Advanced Auto Parts. So the facility in which all these people worked was not an appropriate unit at all? We didn't believe that it was because of the community of interest that those drivers had with the drivers servicing this Advanced Auto Parts customer at the other eight locations. However, I would say, you know, our argument there is similar in part to the argument we're making with regard to Mr. Capetta, and I think it's even more the case on the bargaining unit issue is that this truncated process didn't give us the opportunity to develop that case the way we would have if we had more time. You know, we didn't even have a chance to speak to the eight service center managers at the eight other places. We had to go with what we could figure out by talking to the Cutstown service center manager. So, again, we didn't have the time to adequately prepare and put on that case. On the board's point that there were other ways to campaign, I just wanted to note that neither the board nor the acting director ever talked about that. You know, the argument over whether we could have more effectively campaigned besides group meetings is post-hoc argument, and I don't think the court has to consider it. And on the taint question, you know— Let me just stop you there. You're familiar, I take it, with Judge Jackson's opinion in the Chamber of Commerce case? Yes, Your Honor. And at some point in that lengthy opinion, she mentions that the campaigning that's done now is done digitally mostly. It's not face-to-face. It's through e-mails and other communications through electronic media. Yes. She made a finding to that effect. Well, she— She could have done that. She may have said that, Your Honor, and theoretically, you know, could we send a text message to a driver while they're on the road? Hopefully they won't read it while they're driving. But, you know, I subscribe to the notion that there's nothing like a good old-fashioned face-to-face conversation, and that's never going to change. And so I don't think electronic communication is a fair substitute for face-to-face advocacy and face-to-face communication, particularly group communication. Let me just ask if there's further questions from the bench. Okay, hearing none, we'll take the matter under submission. Thank you, Your Honor. Again, thanks to both sides for an interesting argument. We appreciate it. We'll take recess.
judges: Garland, Srinivasan, Randolph